Nott, J.
delivered the opinion of the Court.
A motion is made for a new trial in this case, on two grounds.
1st. Because the verdict is contrary to law and evidence, inasmuch as the plaintiff committed a breach of warranty in continuing on the coast of Africa more than four months, contrary to an express stipulation in the policy, whereby the defendants became exonerated. And, 2dly,Beeause the plaintiff was guilty of a deviation, without *207 any justifiable cause, in going to Matanzas instead of coming to Charleston or going to Nassau, .which was a nearer port. Under these two general grounds, it is also contended that the presiding Judge misdirected the Jury in several respects, which I shall notice in the course of my observations. One misdirection of the Court is, that the Judge directed the Jury, “ that where the risk or policy can be properly and naturally divided into parts, that there it should be done ; that this being the case here, the insurance to should be considered as one risk, at and from a second risk, and the homeward, voyage a third.” The ingenuity and learning of counsel have been exhausted in resisting this principle. A contrary construction of this policy is drawn from the words “ until the said vessel shall be arrived and moored at anchor twenty-four hours in safety which words, it is contended, having a direct reference to the final termination of the voyage at Charleston, furnish satisfactory and conclusive evidence that the parties considered it as one entire and indivisible contract. I have taken up this question in this place, in order that I may dispose of it before I consider the two principal grounds relied on, because I deem it utterly immaterial, as it regards the motion now before us, in which point of view it is considered. For whether we consider it one continued policy, or one capable of division, we must ascertain at what period the outward voyage terminated, in *208 order to fix the period when the four months be* gan during which she was permitted to stay on the coast. And if they had been two distinct policies the question wofild have been precisely the same, for the same evidence by which the termination of one would be ascertained, would determine the commencement of the other. The lime the risk shall continue on a ship bound to a place does not appear to be settled by any general rule. In some countries it continues until she arrives at her place of destination, and is entirely discharged; in others it is made to end twenty-one days after her arrival, or sooner, if she be unloaded. In France it continues until her arrival, and until she be there anchored and moored at the quay. In England and the United States it is usually made by the policy to continue “ until she shall be arrived and moored at anchor twenty-four hours in safety.” (1 Marshall, 261.) And my present impression is, that such would be the construction of law, if there was no express stipulation to that effect, (do. 266 ) In the present case we cannot adopt a safer or a better rule; and by fixing the time when the outward voyage terminated, we settle the first question submitted, to wit, whether the plaintiff was guilty of a breach of warranty by keeping his vessel on the coast more than four months.
The captain, in his protest, says, that on the 1st of August, having observed in latitude of Senegal, they tacked ship and stood in for the *209 land.” Let it herd be asked, for what purpose did they stand in for the land ? They were not driven by stress of weather; they were urged by no imperious necessity. The inferdnce, then, is,, for the purposes of trade; the captain intended to make that his first port of destination. This inference is strengthened; if not satisfactorily proved, by his letter, dated Goree, September ' 5th, 1807, wherein he says, “ Sorry I am to inform you that I have to return, (to Senegal,) for what I have on board I can get nothing for here.” In another part of the same letter, he says, “ the tobacco, rum, iron, dry goods, and powder, I shall part with in the Gambia, and the remainder I have to proceed to Senegal with.” This evidence appears to me conclusive of his original intention, though not of his arrival in safety according to the policy: for he was afterwards driven off with the loss of his anchor, before he got up to the town. As further evidence of his intention, he says in his protest that he shaped his course for Goree, there being “ no prospect of his being able to get into Senegalbut having to encounter head winds, and not being able to lay his course for Goree, he returned to Senegal; and arrived at the town on the 9th of August, where he continued until the l5th of the same month. He does, to be sure, say he was detained by the governor until twenty-five barrels of flour were taken from on board ; but that would not have required many hours detention, and it *210 does not appear that he was detained for any other purpose. At all events he. appears to have-been moored in safety, although he had lost an anchor. This must be considered, then, as his first port of destination, and there the outward risk terminated. (Park, 38. 1 Black. 417. Camden v. Corby.) It does not, indeed, áppear that commenced trading there; but in the construction oi policies, regard must always be had to the course and usage of the trade in which the parties are engaged. (Park, 31.) It seems to be admitted that the usual course of trade on the coast of Africa is to sail from port to port, sometimes merely for information, or trade, according to the state of the market. The arrival at a trading town, for the purposes of trade, even though no trading had actually commenced, and having been safely moored at anchor there twenty-four hours, was a termination of the outward voyage. I do not think the case was varied by the loss of the anchor. Suppose a ship bound for London should part her cable at the mouth of the Thames, and. be driven from the coast; if she should return in safety, I presume the underwriters would be discharged, after she had been moored twenty-four hours in safety, although she might have lost her best anchor. And the arrival of this brig at Senegal was as much a termination of the outward voyage, as if that port had been particularly mentioned in the policy. But if we date the commencement of the four months' *211 at Goree, and even after an anchor was procured, she was more than four months on the coast, and therefore the warranty was broken. It is no answer, to say a traffic in slaves was not permit-. ted at Goree; the whole tenor of the captain’s letter speaks a different language. He laments that he can do nothing there ; not because the trade is interdicted, but on account of the unfavourable state of the market;, for he says he has been offered only fifty slaves for his whole cargo. And he afterwards returned from Gambia to Goree, for no other purpose, that can be perceived, but a hope to find a favourable change in the State of the market. The object of the captain, therefore, in going to Goree, is not less manifest than that of his going to Senegal. It was for the purpose of trade, to sell, buy, or merely to gain information, as occasion might offer. It was for these purposes that four months were allowed, if he had met with a favourable market at any one port, as many weeks would probably have been enough, and more than enoiigh. But four months, and no more, were allowed. He exceeded those limits; he has violated the warranty, and the underwriters are exonerated.
in the con-^age^of the trade
*211 It nevertheless becomes necessary to give an opinion on the question of deviation, as the case is to go back to be reviewed by another Jury. Deviation is defined to be, “ a voluntary departure, without necessity, from the usual course of the voyage.” 1 Mar. 183. The question then *212 is, was there any such necessity for departing from the usual course of the voyage in this case ? Were there any such obstacles to the prosecution of the voyage, as authorized the captain to substitute Matanzas as the terminus ad quern, instead of Charleston ? The act of Congress prohibiting the introduction of slaves, is alleged by the counsel as good cause, and there is no doubt but that, to avoid capture or detention, will authorize a deviation, where thé danger arises after the contract is entered into, or perhaps where it was not known at the time, although it might have actually existed. Marshall, 211. But here the voy- ** J age was undertaken with a full knowledge of the danger, and the plaintiff himself had undertaken ° x warrant against it; and he was not authorized to substitute a new voyage at the risk of the un4/0 derwriters, to avoid a peril which he had stipulated to incur himself, and which they had expressly excepted. But this is not a reason given by the captain in his protest. His reason is, “ because it was concluded to be dangerous and unsafe to venture on the American coast at that season of the year.” But it was well known, when this voyage was undertaken, that that dam ger was to be encountered. They had no adverse winds, no unfavourable weather, but a mere pretended apprehension of possible dam ger. But how does this comport with his letter written from Goree ? In that he says, “ I am in little hopes of getting home in time, and *213 therefore I hope you will not neglect of putting a letter on board of every pilot-boat, to inform me how to proceed.” Why inform him how to proceed ? The reason is apparent. He knew he could not come into Charleston. And after his long delay, which would necessarily protract the voyage beyond the thirty-first of December, he never intended it. For he further says, “ do be particular with your letters, for 1 will not come in sight of the bar, if it please God that I get off the coast.” Here is an express declaration of an intended departure. But again he says, he had lost several of his crew ^ others were sick; the vessel was leaky in her upper- works, and they were short of bread: it therefore was thought best for the “ general interest of the owners of the vessel and cargo, to bearaway for thefirstpórt ” Yet he passed by Nassau, which he acknowledges to have been the nearest port; because he says, having heard of the attack on the Chesapeake, he supposed war had taken place between Great-Britain and the United States. He therefore thought it more prudent and safe to proceed to Matanzas, that haven of safety, into which it- appears that most of the vessels engaged in the African trade were blown at that time. But no words or arguments can disguise the real motives for the departure in this case. The vessel had unfortunately been detained on the coast of Africa, until it became impossible for her to return before the prohibitory act of Con *214 gress took effect. It became necessary, therefore, to look out for another port. Matanzas furnished the best prospect, perhaps, of disposing of the cargo to advantage. On her way there, however, the vessel was unfortunately lost; and this is an attempt to visit the misfortune on the underwriters. The apprehension of a war between the United States and Great-Britain was a groundless pretext. If any such danger existed, it was not of that imposing character as justified the measure.
The insured having warranted ture^&c^aflerthe (meanS|thebact of Congress pro-trbde!jEit atbftoabputdtoto a foreign port, to pi'too Safedn°arodVstátesheUmt
Misapprehension of the Judge as to a material fact, and a direction to the Jury accordingly, is, an irresistible ground for anew trial.
But the misdirection of the presiding Judge on the question of deviation, furnishes an irresistible ground for a new trial. It appears from the Judge’s report, that he was under an impression there had been a subsequent contract between the parties, by which the vessel was permitted to remain on the coast two months longer than was first agreed on; from which he instructed the Jury, « The underwriters must have been aware it would be impossible for her to perform the third part of the voyage, viz. the return one to Charleston, before the 31st of December” — “ that they therefore acknowledged by this after contract, the right the vessel would have to make a different voyage.”
But it does not appear by the evidence reported to this Court, neither is it pretended by the counsel, that any such evidence was produced at the trial. As the Judge was mistaken in the fact, his conclusion was erroneous; and *215 the Jury, in all probability, were misled by his opinion.
Ford, for the motion.
Drayton and Grimké, contra.
A new trial must therefore be granted.
The other Judges concurred, except Cheves, J. who gave no opinion, being interested as a stockholder in the Company.